UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | No. 1:05-CR-75 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| | ) | |
| STANLEY DILLARD | ) | |
| | ) | |

## **MEMORANDUM**

Before the Court is Defendant Stanley Dillard's ("Defendant") Motion For New Trial (Court File No. 50). The Government filed a response to Defendant's motion (Court File No. 59) and Defendant filed a reply (Court File No. 60). For the following reasons, the Court will **DENY** Defendant's motion.

### I. RELEVANT PROCEDURAL AND FACTUAL HISTORY

Defendant was charged in a one-count indictment of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1) (Court File No. 2). Following a plea of "not guilty," Defendant proceeded to trial before a jury of his peers, which covered parts of three days.[1] At the close of the Government's proof, Defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The Court denied the motion and on June 6, 2005, the jury found Defendant guilty (Court File No. 56). Defendant did not renew his Rule 29 motion, rather,

---

[1] The trial commenced on May 30, 2006, was continued until June 5, 2006, and then concluded on June 6, 2006.

he requests the Court to order a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis the jury's verdict was against the manifest weight of evidence.

The Court will briefly summarize the relevant testimony as it was presented during the trial below:

Ciara Bridgeman ("Bridgeman"), Defendant's girlfriend, testified she came home one day in June 2006 and found Defendant sleeping with her cousin. She became upset and kicked Defendant out of the house. Three days later, on June 16, 2006, she left her residence in Dayton, Tennessee and traveled to Chattanooga, Tennessee in the afternoon. While in Chattanooga, she stopped by Defendant's residence but did not see Defendant. She then went back to Dayton. Sometime in the evening,[2] she was standing by a Dodge Intrepid owned by her and Defendant, in front of her cousin's house in Dayton. While standing there, she saw a white Honda drive by. She remembered Defendant and three other males were inside the car and Defendant began cursing and yelling at her. About thirty minutes later, they drove by again and Defendant fired a gun at or near her. Three bullets hit the Dodge Intrepid. After the shooting, she called Defendant on a cell phone and allowed Officer Adam Smith to listen to the conversation on the speaker phone. Defendant said he was the one who had shot the car and he was trying to kill her.

On cross examination Bridgeman admitted she was still in love with Defendant and wrote him love letters. In one of the letters Bridgeman stated she knew Defendant was not around the day the car was shot because he was in Chattanooga for his son's birthday. She also explained at one time she thought the shooter was her cousin Cory Wilson because Mr. Wilson had told her he was the one who fired the shots.

---

[2] She was not sure of the exact time but recalled it was getting dark.

2

Case 1:05-cr-00075   Document 61   Filed 08/11/06   Page 2 of 8   PageID #: 5

Dayton Police Department Officer J.C. Byrd ("Byrd") testified he arrived at the scene of the shooting around 9:30 p.m., shortly after the police were notified of the incident. Smith stated he found three .380 caliber shell casings in the road near where the Dodge Intrepid was parked. When he arrived at the scene it was dark so he used a flashlight to assist him in finding the shell casings. However, he noted there were streetlights near where the shooting took place.

Dayton Police Officer Adam Smith ("Smith") testified he assisted in the investigation of the shooting. After he arrived at the scene, he listened to a phone call between Bridgeman and an unidentified male on the speaker phone. He testified the male caller said, "I didn't shoot your car. I shot my car" and "When I find you, I'm going to beat your hind end."[3] Smith also testified it was dark outside when he arrived at the scene.

David Brooks ("Brooks") admitted during his testimony he was a felon who had been in possession of a .380 automatic handgun. He explained he was no longer in possession of the handgun because Bethany Pankey stole it.

Michael Hutcheson ("Hutcheson"), a car salesman in Pikeville, Tennessee, testified he sold a Dodge Intrepid to Defendant and Bridgeman on June 10, 2005. When he retrieved the car a few weeks later, the car had bullet holes in it.

Natalie Draper ("Draper") testified a birthday party was held for her and Defendant's son, Gregory, on June 16, 2006 in Chattanooga. According to Draper, the party started in the afternoon and lasted for four or five hours. She stated Defendant and Bridgeman were at the party and

---

[3] Smith stated he was paraphrasing what was actually said because in reality there was some profanity used.

Defendant left the party with Bridgeman about 8:30 or 9:00 p.m.[4]

Joanne Hester ("Hester"), Draper's mother, also testified Defendant left Gregory's birthday party between 8:30 and 9:00 p.m. Although she was unsure of the exact time, she thought it was closer to 9:00 p.m. because she remembered seeing Defendant about the same time a television show she liked started. The television show started at 9:00 p.m.

Linda Dillard ("Dillard"), Defendant's mother, testified Defendant came to her house on June 16, 2006 about 8:30 or 9:00 p.m. to spend the night. However, she admitted she was unsure about the time he arrived in part because she was already asleep before he arrived.

Bethany Pankey ("Pankey"), Bridgeman's cousin, testified she sold Defendant a gun she got from Brooks about a week before the shooting. She stated the gun was a black .380 handgun. Further, she heard Defendant make threats against Bridgeman. Specifically, Defendant had threatened to kill Bridgeman. While under oath, Pankey admitted she was addicted to crack cocaine and smoked it about three or four days a week. She also testified Bridgeman did not have a reputation for being a truthful person.

Guy Aycock ("Aycock"), a professional investigator hired by Defendant, testified it takes about 55 minutes to drive from the house where Gregory had his birthday party to the location of the shooting.

II. **DISCUSSION**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The decision to order a new trial is

---

[4] Bridgeman testified she did not attend the birthday party.

4

committed to a court's sound discretion, which is subject to review for abuse. *United States v. Talley*, 164 F.3d 989, 1002 (6th Cir. 1999); *United States v. Davis,* 15 F.3d 526, 531 (6th Cir. 1994); *United States v. Chambers*, 944 F.2d 1253, 1263 (6th Cir. 1991). In deciding whether a new trial is warranted, a court should primarily concern itself with whether the prior proceedings were fair for the accused. *See Davis*, 15 F.3d at 531-32. When considering a motion for a new trial based upon the weight of the evidence, the district court can consider the credibility of witnesses and the weight of the evidence to ensure there is not a miscarriage of justice. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998) (citing *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988)). Some courts have referred to the district court's role in deciding these motions in terms of the court sitting as the thirteenth juror. *Id*. Nevertheless, the court should grant such a motion "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Ashworth*, 836 F.2d at 266. Motions for new trials are not favored and should only be granted with great caution and in extraordinary circumstances. *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976); *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967). A defendant bears the burden of proving a new trial should be granted. *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991).

In order to establish a violation of 18 U.S.C. § 922(g)(1), as alleged in the indictment, the Government must prove beyond a reasonable doubt (1) Defendant had previously been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; (2) following that conviction, Defendant knowingly possessed the ammunition described in the indictment; and (3) such possession was in or affecting interstate or foreign commerce. *United States v. Arnold*, 410 F.3d 895, 904 (6th Cir. 2005). Defendant stipulated to the first element at trial and does not

5

challenge the Government's proof with respect to the third element.[5] However, Defendant argues the evidence presented at trial weighed heavily in his favor on the second element.

Although evidence was presented at trial from which a juror could conclude the Government had not proven its case beyond a reasonable doubt, a new trial is not warranted because there was more than enough evidence for a jury to find Defendant possessed the ammunition at issue. In particular, Bridgeman claimed Defendant was the person who shot at her. Further, Smith heard a male caller, whom Bridgeman identified as Defendant, admit to shooting the gun in an attempt to kill Bridgeman shortly after the incident. The caller on the phone stated "I didn't shoot your car, I shot my car." The most logical person to make such a statement would have been Defendant because he and Bridgeman had just purchased the car about one week before the shooting. Also, the shell casings found at the scene by Byrd were .380 caliber, the same kind of ammunition used to fire the handgun Pankey testified she stole from Brooks and sold to Defendant shortly before the shooting.

It is clear the Government's case rested principally on the testimony of Bridgeman. Defendant argues Bridgeman's testimony was "clearly unreliable" because (1) at one point in time after the shooting, Bridgeman stated the shooter was Cory Wilson, not Defendant; (2) it was dark outside when the shooting occurred; (3) she stated in a love letter to Defendant he was not the shooter; and (4) her testimony she was not at the birthday party contradicted Draper's testimony she was at the party. The Court had the opportunity to see and listen to Bridgeman testify in person. The Court believes her testimony was credible enough for the jury to find Defendant guilty beyond

---

[5]Bureau of Alcohol, Tobacco and Firearms Special Agent Neal Harper testified at trial the shell casings found at the scene of the shooting crossed state lines.

a reasonable doubt. While it is true at one time Bridgeman stated she believed the shooter was not Defendant but rather Cory Wilson, she stated her belief was based solely on Cory Wilson's after the fact representation he was the shooter. It is reasonable Bridgeman would have wanted to believe Cory Wilson's version of the events, as she testified she was still in love with Defendant. Although it may have been dark when the shooting occurred, street lights were lit near where the shooting occurred. Lastly, it is not uncommon for two witnesses to make contradictory assertions. Nevertheless, even if Bridgeman lied on the stand about her presence at the birthday party, the Court would still not conclude the rest of her testimony was entirely unreliable.

Defendant also asserts the testimony of Draper, Hester, and Dillard that Defendant was in a specific area of Chattanooga around 8:30 or 9:00 p.m. on June 16th combined with Aycock's testimony it takes 55 minutes to drive from the area of Chattanooga where they said Defendant was to the location of the shooting in Dayton which took place about 9:24 p.m. provides Defendant with a solid alibi. The Court, sitting as a thirteenth juror, does not believe Defendant's alibi can be described as solid. Draper, Hester, and Dillard each "have reason to want [Defendant] to be acquitted . . ." (Court File No. 51, p. 6). Draper has two children with Defendant, Hester is the grandmother of those children, and Dillard is Defendant's mother. Therefore, it is in each of their interest to testify Defendant was in Chattanooga at the time the shooting took place in Dayton. Regardless, taking their testimony at face value, the Court is still not convinced it was impossible or even improbable for Defendant to have been in Dayton at 9:24 p.m.

Draper testified Defendant left the birthday party with Bridgeman about 8:30 or 9:00 p.m. Defendant does not dispute Bridgeman was in Dayton at 9:24 p.m. Therefore, if Bridgeman made it from the party to Dayton by 9:24, Defendant could also have made it to Dayton from the party in

7

time to shoot at Bridgeman. With respect to Defendant's mother, she testified she was uncertain what time Defendant arrived at her house because she was asleep before he arrived. As for Hester, she too was unsure of the exact time Defendant left the birthday party.

Accordingly, the Court concludes the jury's verdict was not against the manifest weight of evidence and no extraordinary circumstances are present to justify a new trial. Thus, it will **DENY** Defendant's motion for a new trial.

### III.   CONCLUSION

Because the interests of justice do not warrant a new trial in this case, the Court will **DENY** Defendant's motion for new trial (Court File No. 50).

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**